United States District Court
Southern District of Texas
**ENTERED**
March 29, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, *Plaintiff*, | § § § § | |
| v. | § § | CIVIL ACTION NO. 4:20-CV-01187 |
| TESHUATER, LLC, LARRY DONNELL LEONARD, II, SHUWANA LEONARD, and TESHUA BUSINESS GROUP, LLC, *Defendants*. | § § § § § | |

## ORDER

Before the Court is Plaintiff's Motion for Summary Judgment (Doc. No. 32) filed by the Securities and Exchange Commission. Although the Motion was filed against all named Defendants, none of the Defendants have chosen to file a response, and the time for doing so has long since passed.

### I.   Controlling Summary Judgment Principles

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the nonmovant to show that the Court should not grant the motion. *Celotex Corp.*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A dispute about a

material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255.

Local Rules 7.3 and 7.4 of the Southern District of Texas state that a response to a motion will be submitted to the judge within twenty-one (21) days after filing and that the failure to respond will be taken "as a representation of no opposition." Rule 7.4(a) plainly states that such responses must be filed by the submission date, which in this case, passed long ago.

Therefore, the local rules would allow the Court to grant Plaintiff's motion as it should be considered unopposed. However, the Fifth Circuit has explained that "although we have endorsed the adoption of local rules that require parties to file responses to opposed motions, we have not approved the automatic grant, upon failure to comply with such rules, of motions that are dispositive of the litigation." *See Johnson v. Pettiford*, 442 F.3d 917, 918 (5th Cir. 2006) (first citing *Johnson v. Louisiana*, 757 F.2d 698, 707-09 (5th Cir. 1985); then citing *Ramsey v. Signal Delivery Serv.*, 631 F.2d 1210, 1213-14 (5th Cir. 1980)).

Consequently, the Court has reviewed the prevailing law, the current motion, and the attached summary judgment evidence. This evidence included sworn testimony of two of the Defendants and at least two putative investors, affidavits/declarations from the investigators in the case, and a variety of supportive documentations. Having considered all this evidence and having been provided no evidence to the contrary, the Court hereby GRANTS the Motion and makes the following findings of fact based upon the summary judgment record and conclusions of law based upon the findings and the applicable law.

**II.     Findings of Fact**

1. Larry Leonard and his wife Shuwana Leonard created and controlled Teshuater and TBG. Larry Leonard is the president of both companies and Shuwana Leonard is their director of operations.

2. Teshuater is a Texas member-managed limited liability company formed in 2017 by the Leonards with its principal place of business in Houston, Texas. TBG is Teshuater's sole managing member. The Leonards touted Teshuater as the first Black-owned alkaline water company. Although Teshuater had some operations, it generated minimal revenues. On August 20, 2021, the Texas Secretary of State forfeited Teshuater's certificate of formation.

3. TBG is also a Texas member-managed limited liability company formed in 2017 by the Leonards with its principal place of business in Houston, Texas. TBG's members include the Leonards.

4. Between May 2017 and February 2019, the Leonards raised approximately $486,984.28 from more than 500 investors located in various states, including Alabama, California, Georgia, Maryland, Missouri, New York, Pennsylvania, Tennessee, Texas, and Virginia. They obtained these funds through the offer and sale of three separate investments: (i) bogus Teshuater "stock certificates;" (ii) a crypto asset security dubbed TeshuaCoin; and (iii) a purported Bitcoin-mining operation. Defendants obtained approximately: (i) $291,044.07 from the sale of Teshuater stock certificates; (ii) $170,395.25 from the sale of TeshuaCoin; and (iii) $25,544.96 from the sale of the Bitcoin-mining investment.

5. The Leonards solicited investors and obtained funds from them by, among other means, using interstate communications including email, Teshuater's website, and social media platforms such as Facebook. During these solicitations, Larry Leonard used his status as an

African American pastor to sway investors. Investors paid money to the Leonards and their businesses in exchange for shares of Teshuater stock, TeshuaCoin, and the Bitcoin-mining investments. The success or failure of the investments was entirely dependent upon the efforts and expertise of the Leonards, as the investors had no active role regarding their Teshuater, TeshuaCoin, or Bitcoin-mining investments; said another way, these were entirely passive investments from the perspective of the investors. None of the investment offerings were registered with the SEC.

6. To operate Teshuater and TBG, the Leonards used bank accounts. The Leonards had access to, and control over, the following bank accounts: (i) BBVA Compass Bank account ending in 9575 in the name of TBG, (ii) J.P. Morgan Chase Bank N.A. account ending in 2207 in the name of Teshuater; (iii) J.P. Morgan Chase Bank N.A. account ending in 5852 in the name of TBG; and (iv) Origin Bank account ending in 5805 in the name of Larry Leonard d/b/a TBG.

7. Investors sent funds to Teshuater's and TBG's bank accounts, as well as to Defendants' Stripe and Shopify accounts. The Leonards deposited the investor funds they received through these payment services into Teshuater's and TBG's bank accounts.

8. The Leonards commingled investor funds with money from other sources in Teshuater's and TBG's bank accounts. The Leonards then used the majority of the commingled investor funds to pay their personal living expenses, including rent, travel, retail purchases, and dining. They also used investor funds to repay unrelated business loans. As an example, the Leonards transferred investor funds raised from the Bitcoin-mining investment to a jointly owned personal securities account where Larry Leonard used the funds to trade options—not to fund Bitcoin mining. After losing money from the options trades, the Leonards used the remaining Bitcoin-mining funds to pay off unrelated business loans.

9. The Leonards offered and sold Teshuater "stock certificates," telling investors that they would become part-owners of Teshuater if they purchased the shares of stock. However, Teshuater is not a corporation; it is a limited liability company that does not have, and cannot issue, shares of stock.

10. Nevertheless, the Leonards prepared and distributed stock certificates that purported to document the number of Teshuater shares that each investor had purchased. But the Leonards neither issued themselves stock certificates to document their ownership of Teshuater nor tracked the shares of Teshuater stock that they claimed to have sold to investors.

11. Further, Larry Leonard arbitrarily set the price of Teshuater's stock, which typically ranged from 10 to 15 cents per share. Larry Leonard promised investors that Teshuater's shares of stock would increase in value. During one Facebook Live presentation, Larry Leonard stated that a $50 investment in Teshuater would be worth "$750 overnight just like that." Later during that same presentation, he claimed that a $1,000 investment in the company would be worth $30,000 in "a few days." Prior to soliciting investments in Teshuater's shares, Larry Leonard failed to provide investors with any warnings regarding the risks associated with their investments.

12. The Leonards told investors that the money raised from the sales of Teshuater stock would be used to operate and market the company and to take it public—not to pay the Leonards' personal expenses or to repay unrelated business loans. Defendants received approximately $291,044.07 from the sale of Teshuater stock, while their investors received none of the promised returns and lost virtually all of the money that they invested.

13. Larry Leonard prepared and distributed to investors a white paper introducing TeshuaCoin—a crypto asset security issued by Teshuater (the "White Paper"). According to the

White Paper, Teshuater planned to raise $20 million from the TeshuaCoin offering. The White Paper claimed that TeshuaCoin was a "fully functioning cryptocurrency" that could be "traded and utilized in much the same way as Bitcoin." The White Paper also stated that TeshuaCoin's "value and usability are protected over time." Larry Leonard also told investors that TeshuaCoin was unique among existing crypto asset securities because it was "backed" by Teshuater's assets (i.e., its bottled alkaline water). TeshuaCoin's purported backing by Teshuater's assets was a significant factor in investors' decisions to purchase TeshuaCoin.

14. Larry Leonard told investors that they would become millionaires by investing in TeshuaCoin and that each TeshuaCoin, which he and Teshuater sold to investors for as little as one cent, would be worth $100 or more once it started trading on an exchange. Prior to soliciting investments in TeshuaCoin, Larry Leonard failed to provide investors with any warnings regarding the risks associated with their investments.

15. In fact, investors could not use TeshuaCoin as currency like Bitcoin or other widely circulated crypto asset securities. Furthermore, TeshuaCoin was not backed by Teshuater's assets, as Larry Leonard never took the steps needed to tie the assets to TeshuaCoin. Although Larry Leonard eventually paid to list TeshuaCoin on a crypto asset exchange, TeshuaCoin never generated the trading volume, price, or utility needed to make his promises come true.

16. Larry Leonard told investors that he would use the funds raised from the sales of TeshuaCoin to support TeshuaCoin and to grow Teshuater's business. Had investors known that the Leonards would instead use the money to pay the Leonards' personal expenses and to repay unrelated business loans, they would not have invested in TeshuaCoin. Defendants received

approximately $170,395.25 from the sale of TeshuaCoin, while their investors received none of the promised benefits or returns and lost virtually all of the money that they invested.

17.     Larry Leonard solicited additional investments in a purported Bitcoin-mining operation, promising investors that they would receive weekly payouts with projected returns of up to 50 percent within just a few months. Prior to soliciting investments in the Bitcoin-mining operation, Larry Leonard failed to provide investors with any warnings regarding the risks associated with their investments.

18.     Teshuater never had a Bitcoin-mining operation. Moreover, Larry Leonard, contrary to his promises to investors, used none of the investor funds for Bitcoin mining. Instead, he used the money to trade options and pay off unrelated business loans. Defendants received approximately $25,544.96 from the sale of the Bitcoin-mining investment, while their investors received none of the promised returns and lost all of the money that they invested.

### III.     Conclusions of Law

1.     The Leonards, on behalf of Teshuater, offered and sold purported shares of Teshuater stock to investors which were securities, as both the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ("Exchange Act") define "security" to include "stock." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10); *see also Landreth Timber Co. v. Landreth*, 471 U.S. 681, 686 (1985) (holding that instruments bearing a "traditional title" whose names carry well-settled meaning are likely to be securities). The bogus nature of the shares of stock is irrelevant to their status as securities. *See First Nat'l Bank v. Estate of Russell*, 657 F.2d 668, 673 n.16 (5th Cir. 1981) (noting that the SEC has jurisdiction even if the "security purportedly traded is nonexistent or fictitious…. A contrary result would encourage rather than curb fraud.") (internal citation omitted); *Seeman v. United States*, 90 F.2d 88, 89 (5th Cir. 1937).

2. Larry Leonard, on behalf of Teshuater, also offered and sold TeshuaCoin and a purported Bitcoin-mining investment to investors. The Securities Act and the Exchange Act define the term "security" to also include "investment contracts." 15 U.S.C. § 77b(a)(1); 15 U.S.C. § 78c(a)(10). An investment contract qualifies as a security if it meets three requirements: (i) an investment of money; (ii) in a common enterprise; and (iii) an expectation of profits to be derived solely from the efforts of individuals other than the investor." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946); *Williamson v. Tucker*, 645 F.2d 404, 417–418 (5th Cir. 1981). In applying these requirements, the Supreme Court has directed courts to disregard "legal formalisms" and instead focus on "the economics of the transaction." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).

3. The TeshuaCoin and Bitcoin-mining investments were also securities. The first Howey factor is met because investors paid money to obtain TeshuaCoin and to invest in the Bitcoin-mining investment. Second, the "common enterprise" requirement is satisfied by a showing of "broad vertical commonality," where the fortunes of investors are linked to the efforts and expertise of the promoters. *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 479 (5th Cir. 1974). Broad vertical commonality exists here because Larry Leonard pooled investors' money into Teshuater and TBG bank accounts to support the operations of TeshuaCoin and the Bitcoin-mining program, and the investors' returns depended solely on his successful use of their funds. For the same reason, the third requirement is satisfied. Investors had a reasonable expectation of profits to be derived from Larry Leonard's management of TeshuaCoin and the Bitcoin-mining program, as investors had a passive role in these enterprises.

4. Although a Howey analysis of the offers and sales of shares of Teshuater stock is not required because the statutory definitions of "security" include "stock," these offers and sales

also satisfy Howey for the same reasons outlined for TeshuaCoin and the Bitcoin-mining investment.

5. None of the offers and sales of Teshuater stock, TeshuaCoin, and the Bitcoin mining investment were registered with the SEC.

6. Teshuater and the Leonards used interstate communications including email, Teshuater's website, and social media platforms to find and communicate with potential investors located throughout the United States. Therefore, Teshuater stock, TeshuaCoin, and the Bitcoin-mining investment were offered and sold through interstate commerce. *See SEC v. Straub*, 921 F.Supp.2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce.'").

7. Teshuater and the Leonards violated Sections 5(a) and 5(c) of the Securities Act. *See SEC v. Farmer*, No. 4:14-CV-2345, 2015 WL 5838867, *18 (S.D. Tex. Oct. 7, 2015) (granting the SEC summary judgment on Section 5 claims upon its prima face showing that unregistered shares of company stock were sold to investors).

8. Section 17(a) of the Securities Act makes it unlawful, in the offer or sale of securities, to employ any device, scheme, or artifice to defraud; to obtain money or property by means of any material misstatements or omissions; or to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit. 15 U.S.C. § 77q(a). Section 10(b) of the Exchange Act prohibits using a manipulative or deceptive device or contrivance in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). Exchange Act Rule 10b-5 makes it unlawful, in connection with the purchase or sale of securities: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of

the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5. *In Lorenzo v. SEC*, 139 S. Ct. 1094, 1101–102 (2019), the Supreme Court held that these antifraud provisions are "expansive" and "capture a wide range of conduct."

9. To violate Securities Act Section 17(a)(2) and Exchange Act Rule 10b-5(b), the misrepresented or omitted facts must be material. Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in his or her investment decision and would view it as having significantly altered the total mix of available information. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

10. Violations of Section 17(a)(1) of the Securities Act and Section 10(b) and Rule 10b-5 of the Exchange Act require scienter, while Sections 17(a)(2) and (3) of the Securities Act only require negligence. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). In the Fifth Circuit, scienter may be established by showing that the defendant acted intentionally or with severe recklessness. *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (scienter is an "'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading buyers or sellers is either known to the defendant or so obvious that the defendant must have been aware of it'") (citations omitted).

11. Larry Leonard, on behalf of Teshuater, made material misstatements and omissions to investors regarding: (i) the shares of Teshuater stock; (ii) TeshuaCoin; and (iii) the

Bitcoin-mining investment. Shuwana Leonard, on behalf of Teshuater, made material misstatements and omissions to investors regarding the shares of Teshuater stock. Defendants obtained nearly $500,000 from investors in connection with these material misstatements and omissions.

12. The Leonards and Teshuater were "makers" of these misstatements and omissions. *See Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011). The Leonards created and disseminated the bogus Teshuater "stock certificates." Larry Leonard drafted and disseminated the White Paper describing TeshuaCoin. He also made oral misstatements and omissions to investors about investment risks and returns, the use of investor funds, and other matters. *See Janus*, 564 U.S. at 142. Teshuater was a maker of each of the Leonards' misstatements and omissions because the Leonards made them in their capacities as Teshuater control persons. *See Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 365–66 (5th Cir. 2004) ("Statements attributed to individual defendants are also treated as having been made by [the company], as all of them appear . . . to have been made pursuant to their positions of authority within the company.").

13. The misstatements and omissions were material. Reasonable investors would not have invested had they known: (i) the shares of Teshuater stock were worthless; (ii) TeshuaCoin had no real value and was not backed by Teshuater's alkaline water; or (iii) the Bitcoin-mining program never existed. *See Basic*, 485 U.S. at 231-32; *TSC Indus., Inc.*, 426 U.S. at 449.

14. The Leonards made these material misrepresentations and omissions with scienter. The Leonards knew, or were severally reckless in not knowing, that the purported shares of Teshuater stock were worthless. Larry Leonard knew, or was severely reckless in not knowing, that TeshuaCoin had no real value and was not backed by Teshuater's alkaline water.

11

Larry Leonard also knew, or was severely reckless in not knowing, that the Bitcoin-mining program never existed. The Leonards' scienter is imputed to Teshuater because they controlled Teshuater and acted on behalf as its president and director of operations. *See SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1089 n.3 (2d Cir. 1972) (imputing individual defendant's "awareness of the securities laws violations" to entities he controlled).

15. Teshuater and the Leonards violated Securities Act Section 17(a)(2) and Exchange Act Section 10(b) and Rule 10b-5(b) thereunder.

16. Defendants also engaged in a course of conduct designed to deceive investors. The Leonards, on behalf of Teshuater, told investors that their investment funds would be used for Teshuater, TeshuaCoin, and the Bitcoin-mining program. Contrary to these promises, Defendants misappropriated investor funds and used the money to pay the Leonards' personal expenses and to repay unrelated business loans. TBG was integral to this scheme as the Leonards and Teshuater used TBG's bank accounts to facilitate their misuse of investor money. Defendants' misappropriation of investor funds constitutes a fraudulent scheme. *See SEC v. Zandford*, 535 U.S. 813, 815 (2002) (using proceeds of investment in manner not authorized by or disclosed to investor constitutes deceptive conduct).

17. The Leonards engaged in this course of conduct with scienter. The Leonards knew, or were severally reckless in not knowing, that they were using investor funds for unauthorized purposes. The Leonards' scienter is imputed to Teshuater and TBG because the Leonards controlled both companies and acted on their behalf as their president and director of operations. *See Manor Nursing Ctrs.*, 458 F.2d at 1089 n.3.

18. Defendants violated Securities Act Sections 17(a)(1) and (3) and Exchange Act Section 10(b) and Rules 10b-5(a) and (c) thereunder.

## IV. Conclusion

**HAVING FOUND** there to be no genuine issue as to any of these material facts, the SEC is entitled to summary judgment as a matter of law as to Defendants' liability on all claims asserted by the SEC against them. Therefore, the Motion must be, and hereby is, **GRANTED**.

**IT IS THEREFORE ORDERED** that Teshuater, Larry Leonard, Shuwana Leonard, and TBG are liable for violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**IT IS FURTHER ORDERED** that Teshuater, Larry Leonard, Shuwana Leonard, and TBG are liable for violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**IT IS FURTHER ORDERED** that Teshuater, Larry Leonard, and Shuwana Leonard are liable for violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. § 77e(a) and (c)].

Plaintiff's counsel is ordered to provide this Court with a final order/judgment that will resolve this case.

SIGNED this 29 day of March, 2024.

Andrew S. Hanen
United States District Court Judge